UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE: ZANTAC (RANITIDINE)                     MDL NO. 2924
PRODUCTS LIABILITY                          20-MD-2924
LITIGATION

JUDGE ROBIN L. ROSENBERG
MAGISTRATE JUDGE BRUCE E. REINHART

_____/

**THIS DOCUMENT RELATES TO:**

24-CV-80265
24-CV-80271
24-CV-80264
24-CV-80266

## ORDER DENYING THE PLAINTIFFS' MOTION TO VACATE PRETRIAL ORDER 72

**THIS CAUSE** is before the Court on the Plaintiffs' Motion to Vacate Pretrial Order 72 at docket entry 7311. The Motion has been fully briefed. For the reasons set forth below, the Motion is denied. To organize this Order, the Court first (**A**) summarizes the Motion before (**B**) addressing a core premise of the Motion and (**C**) a strong inference Plaintiffs raise in the Motion. The Court then (**D**) denies the Motion based upon logical reasoning and also (**E**) denies the Motion based upon the history of this MDL and the Court's prior case management decisions. Finally, the Court (**F**) reminds the parties of all pending case management deadlines.

A. **Summary of the Plaintiffs' Motion to Vacate**

Four Plaintiffs filed the Motion before the Court. Each of the Plaintiffs previously participated in a voluntary census program and registry (the "Registry") to assist the Court and the parties in understanding the scope, size, and makeup of this MDL. Although participants in the Registry were not required to certify where they would eventually file their claims, participants could certify if they chose. Each of the Plaintiffs before the Court is a former Registry participant

who chose to certify to file in federal court, not state court.

Yet each of the Plaintiffs filed a claim in Delaware state court, prompting the Defendants to remove their cases to this Court. The Plaintiffs argue that their decision to file in Delaware state court was proper, however, because they never authorized their prior counsel ("Prior Counsel") to certify that their claims would be filed in federal court. The Plaintiffs now request through their current counsel ("Current Counsel") that their prior certifications in this MDL be vacated, thereby permitting their Delaware actions to proceed.

**B. A Premise Underpinning the Plaintiffs' Motion**

Before the Court addresses the specifics of the parties' arguments, the Court addresses a core premise that underpins the Plaintiffs' Motion. The Plaintiffs repeatedly characterize their request for relief as a request to receive due process. For example, the Plaintiffs argue through Current Counsel that if this Court does not grant the Motion, the Court will "deprive them of their day in court." DE 7311 at 24. Prior Counsel for the Plaintiffs argues much the same, contending that the "[f]ailure to consider Plaintiff's cases on the merits because of 'mere technicalities' in the rules of procedure would result in a manifest injustice." DE 7317 at 6.

The Court rejects this argument and its premise. The Plaintiffs certified that they would file their claims in federal court, and at least three of the four Plaintiffs filed cases in this MDL that resulted in final judgment.[1] The question therefore is not, as the Plaintiffs phrase it, whether the Plaintiffs will receive due process because they already have received due process. The Plaintiffs could, and did, file cases in this MDL. They had the opportunity to retain independent

---

[1] No party has explained to this Court, and the Court has been unable to discern, how the Plaintiffs' cases were able to proceed in Delaware after the Plaintiffs' federal cases (raising the same claims against the same parties) terminated with the entry of final judgment.

scientific experts at their own expense if they chose to do so (they declined), just as they had the opportunity to object to the Court's *Daubert* decision in favor of the Defendants—none did. The Plaintiffs also continue to receive due process to this very day as the Court's *Daubert* decision is currently undergoing appellate review. In short, the Plaintiffs' cases *have* been considered on the merits. The question is whether they can be heard on the merits again in a different forum, but that is far different question from whether the Plaintiffs *ever* will be able to receive due process.

### C. A Key Inference Raised in the Plaintiffs' Motion

The Plaintiffs' Motion repeatedly characterizes their Prior Counsel's actions as illegal. By way of example, the Motion describes Prior Counsel's actions as follows: "Without Plaintiff's knowledge or consent, other counsel, **who claimed to represent Plaintiffs**, certified the Plaintiffs as participants in the Zantac Multidistrict Litigation pursuant to PTO 72." DE 7311 at 6 (emphasis added). The clear inference from the emphasized portion of this statement, which continues throughout the Plaintiffs' Motion, is that Prior Counsel *may not have an attorney-client relationship with the Plaintiffs*. Because of the seriousness of that charge, the Court required the parties to completely re-brief the Plaintiffs' request for relief and also required Prior Counsel to file a response, even though Prior Counsel objected to being involved in this matter. *See* DE 7314, 7324.

The record now clearly indicates that Prior Counsel *did* have an attorney-client relationship with the Plaintiffs, a fact that the Plaintiffs do not dispute in their Reply. The question, then, is not whether Prior Counsel formed an attorney-client relationship with the Plaintiffs, but whether Prior Counsel's actions were authorized by that relationship. Those are very different questions.

Had Current Counsel requested relief on behalf of the Plaintiffs with greater candor about

3

the Plaintiffs' prior attorney-client relationships, the Court may not have required Prior Counsel to become involved in this matter (over Prior Counsel's objection) and the Court's ruling would have been rendered with much greater speed, without the need for additional briefing. The Plaintiffs characterize their request as a need for the Court to rule on what "is only fair and just." DE 7311 at 7. But in determining what is "fair and just," it is important for this Court to know that the Plaintiffs *did* have an attorney-client relationship with Prior Counsel.

### D. The Court's Own Characterization of Pretrial Order 72

The Plaintiffs request that their prior certifications under Pretrial Order 72 be vacated. What were those certifications? They were as follows:

> LMI shall add a certification box to the Registry interface as soon as reasonably possible and as directed by the Special Master. The purpose of the checkbox is for a Claimant who has registered or a Plaintiff who has filed in this MDL (collectively, the "Registry Participants") **to certify his or her forum of choice**. If a Registry Participant does not intend to file his or her claim in federal court, the Registry Participant shall not check the box. **If the Registry Participant commits to file his or her claim in federal court** (although no Registry Participant is ever required to file suit) **then the Registry Participant shall check the box** and publish said response to Defendants by no later than June 30, 2022. In checking the certification box, a **Registry Participant also certifies that federal court jurisdiction exists over his or her claims**. As a result of the Registry Participant's certification that federal jurisdiction exists over the Registry Participant's claims, **the Registry Participant must not name a defendant with the same state of citizenship as the Registry Participant** as discussed more fully below in paragraph 5.

Pretrial Order 72, page 3 (emphasis added).

The Plaintiffs emphasize the latter portion of the text quoted above—that their certifications for federal court necessarily required that the Plaintiffs not name a party that would prevent a federal court from exercising jurisdiction over their cases, such as a defendant that destroyed federal court diversity jurisdiction. They emphasize their inability to name diversity-destroying Defendants because they characterize the certifications as a release of claims.

4

The Defendants emphasize the earlier portion of the text quoted above—that the certification was a matter of forum selection. They emphasize the forum selection text because they characterize the certifications as limited to just that, forum selection.

For authority, the Plaintiffs rely upon case law for the proposition that a release of claims requires a client's consent. *E.g., Valenzuela v. Cnty. of San Diego*, No. D056134, 2011 WL 3795538, at *4 (Cal. Ct. App. Aug. 26, 2009). The Defendants do not dispute that proposition. For their part, the Defendants rely upon case law for the proposition that federal forum selection is a tactical decision that is a part of litigation strategy and does not require a client's consent. *E.g., Vallee v. Lachapelle*, 725 F. Supp. 631, 634 (D. Me. 1989) ("[Counsel] clearly had authority to bind his clients as to matters of procedure, including the choice of arbitral forum."); *see also* R. Regul. Fl. Bar 4-1.2 ("[T]he lawyer should assume responsibility for technical and legal tactical issues."). The Plaintiffs do not dispute that proposition. What the parties dispute is what Pretrial Order 72 is. Is it a release of claims, or is it a tactical and procedural decision on forum selection that is part of litigation strategy?

Neither party cites to on-point legal authority on this question, which is unsurprising given the Plaintiffs concede that registries in MDLs are a new, evolving case management concept. The Court therefore resorts to logic and its own reasoning to characterize the Pretrial Order 72 certifications.

Federal forum selection commonly contemplates an inherent decision not to plead certain claims, because some claims cannot be raised in federal court and some defendants cannot be sued in federal court. When a plaintiff's counsel chooses a forum, counsel may necessarily forgo[2] the

---

[2] By choosing to forego pleading certain claims in a particular forum, the foregone claims cannot simply be litigated elsewhere because of the rule against claim splitting. *E.g., Vanover v. NCO Fin. Servs., Inc.*, 857 F.3d 833, 841 (11th

opportunity to plead certain claims or to name certain defendants in order to achieve counsel's desired forum. *See Munro v. Univ. of S. Cal.*, No. CV-16-6191, 2017 WL 1654075, at *5 (C.D. Cal. Mar. 23, 2017) ("Decisions as to venue . . . are vested in the lawyer's discretion, as opposed to the client's."). When a plaintiff's attorney forgoes the pleading of a claim or the naming of a defendant, the plaintiff does not necessarily release, settle, or compromise his or her case. Were the law otherwise, counsel would be <u>compelled</u> to obtain approval from the plaintiff for drafted pleadings that omit a claim for strategic reasons, and certainly no party has provided authority for the proposition that that is indeed the law in the Plaintiffs' jurisdictions. Instead, case law indicates that a plaintiff is bound even by his or her counsel's drafting mistakes, a far cry from not being bound by counsel's premeditated omission of claims against a non-diverse defendant. *E.g., Clemons v. Ala. Dep't of Corr.*, 967 F.3d 1231, 1242 (11th Cir. 2020).

Counsel can make the tactical decision that by forgoing certain claims or defendants, the case is nonetheless made stronger—that it is more likely, not less likely, for the client to be made whole. The evaluation of the comparative legal strength of the claims, together with the weighing of the related procedural advantages and disadvantages of the claims, is clearly an appropriate, procedural, and tactical decision vested in the attorney, not the client. *See Burt v. Gahan*, 351 Mass. 340, 342 (Mass. 1965) ("The attorney usually determines what steps are to be taken in his client's best interest, and the acts of the attorney in the conduct of the litigation are binding upon the client.").

---

Cir. 2017). Relatedly, once a plaintiff loses the unilateral right to amend his or her complaint or to dismiss his or her case without prejudice (which can happen fairly quickly in federal litigation), counsel's decision not to plead certain claims cannot simply be undone; counsel cannot simply move to another forum and plead the previously unpled claims. There is therefore a permanency and consequence to counsel's drafting decisions in the early stages of a case, yet there can be no dispute that such are matters are well within an attorney's authority.

6

Here, the Plaintiffs named as Defendants some of largest and wealthiest corporations in the world, and they alleged that the Defendants were fully liable for their injuries.  By way of example, Plaintiff Gaylon Cusick sued GlaxoSmithKline, Pfizer, Boehringer Ingelheim, and Sanofi for the design and creation of the drug in this case. 24-CV-80271, DE 1-3 at 1.  The market capitalization of Pfizer alone[3] is in excess of $150,000,000,000.  To put it mildly, then, the diverse Defendants the Plaintiffs can sue in federal court can make the Plaintiffs financially whole, should the Plaintiffs prevail.  The Plaintiffs therefore do not necessarily need (or are compelled) to name the local Piggly Wiggly as a Defendant for selling the drug in the check-out aisle, yet that is effectively what the Plaintiffs have done[4] in order to eliminate federal diversity jurisdiction in their cases.  To be sure, they may be lawfully entitled to sue the local Piggly Wiggly; an attorney's decision to forgo such a claim in order to litigate against Pfizer in a federal forum, together with all of the procedural advantages that a federal forum can offer to the Plaintiffs, is a tactical or strategic, procedural decision.  Attorneys can make that calculation. *See Halliburton v. Liberty Cnty. Sch. Dist.*, No. CV-414-179, 2015 WL 5749463, at *2 (S.D. Ga. Sept. 30, 2015) ("[T]he decision to remove a case to the federal forum is a strategic choice that rests within the discretion of counsel.").  And that is exactly what the attorneys did in this MDL when they certified that the Plaintiffs would litigate in federal court.  In Prior Counsel's own words: "Ticking the box on LMI [certification] was a strategic litigation decision counsel had authority to make.  Counsel did so believing (at the time) that it was in the best interests of the client." 20-MD-2924, DE 7304 at 3.

---

[3] Although the market capitalization of Pfizer is not important to the Court's ruling, the Court's stated number comes from https://finance.yahoo.com/quote/PFE/.

[4] Historically in this MDL, plaintiffs have sued small in-state retailers to eliminate federal diversity jurisdiction.  In some instances (including here), however, plaintiffs sue a manufacturer (one among many) in the manufacturer's home state to eliminate federal diversity jurisdiction.

7

In concluding that their prior certification decisions were not settlements or releases of claims, Prior Counsel points out that Pretrial Order 72 certifications are not final. The Court agrees with that reasoning; under Pretrial Order 72 this Court may allow federally-certified Plaintiffs to renew claims against non-diverse Defendants in certain circumstances, such as the discovery of new medical records or "any other reason that the Court deems fair and equitable." In contrast, settlements and dismissals of a claim cannot be subsequently modified for "any reason that the Court deems fair and equitable." But procedural rules can. *See, e.g., Rosenblum v. Jacks or Better of Am. W. Inc.*, 745 S.W.2d 754, 760 (Mo. Ct. App. 1988) ("Employment of an attorney for a client in a lawsuit . . . implicitly authorizes the attorney to bind the client in matters of procedure.").

The Court's reasoning is further reinforced by a hypothetical. No Plaintiff agreed that he or she would forgo a claim against a *specific* Defendant,[5] only a diversity-destroying Defendant. It therefore remained entirely possible (at least theoretically) that a Plaintiff could move to a different state, establish a new residence, and sue what was *formerly* a diversity-destroying Defendant in federal court. *See Morris v. Gilmer*, 129 U.S. 315, 328 (1889) ("If the new citizenship is really and truly acquired, his right to sue is a legitimate, constitutional, and legal consequence not to be impeached by the motive of his removal."). This underscores that what the Plaintiffs agreed to with their certifications was not akin to a release of claims; they still retained the legal ability to sue any Defendant they chose, with any claim they chose, provided it was in the agreed-upon forum.

For the foregoing reasons the Court concludes that Pretrial Order 72, and Prior Counsel's

---

[5] Pretrial Order 72 also included requirements pertaining to the finalization of anticipated Defendants and claims, but those provisions are not involved in the dispute before the Court and the Court therefore does not address them. Those provisions were akin to a deadline for amended pleadings and were subject to being revisited by the Court.

decision to select federal court as the desired forum, was not a release of claims that required the Plaintiffs' consent. It was instead a tactical and procedural forum selection decision that was part of litigation strategy and that likely (but not necessarily) meant that certain claims or Defendants would not be included in the future complaint, which is not the same as a release of claims. Because Prior Counsel's certifications did not require the Plaintiffs' consent, the Plaintiffs have provided no persuasive basis for their certifications to be vacated.

### E.  Pretrial Order 72 in the Context of the Court's Case Management of the MDL

The Court has a second basis for its characterization of Pretrial Order 72 as a forum selection provision, not a release of claims. Articulating that basis requires the Court to take a step back and explain the history of this MDL and how Pretrial Order 72 came to be. Because the Court has summarized this history in other orders in the past, portions of the Court's discussion below are quoted from prior orders.

When the Plaintiffs filed their claims in the Registry (at that time they could accurately be classified as "Claimants"), they received certain benefits for doing so. Of particular importance here, the Claimants were entitled to tolling of the statute of limitations for their claims, but, importantly, the source of authority for the tolling was not this Court. Instead, the source was the Defendants; the Defendants voluntarily agreed to waive (at least in part) their affirmative defenses under any applicable statute of limitations, which meant that the Defendants had considerable control over the lifecycle of the Registry through their potential to *cease* to waive their statute of limitation defenses. Of course, the Defendants wanted something in return for their continued, ongoing waiver of their defenses.

In exchange for the tolling of their claims, the Claimants were at least facially required to

9

file their claims, should they ever elect to file, in federal court. This requirement was clearly set forth in the Court's Pretrial Order 15, page 11: "Claimants who participate in the Registry commit to filing any action relating to Zantac or any ranitidine products, if at all, before this Court in MDL No. 2924." For more than a year, Claimants like the Plaintiffs registered their claims without incident, and the statute of limitations for their claims was tolled. In the summer of 2021, however, the Court became aware of a dispute between the parties on the commitment to file claims in federal court.

> In the summer of 2021, the parties made the Court aware of another dispute stemming from the terms of Pretrial Order 15. That dispute concerned something other than tolling; it concerned the Claimants' commitment to file their claims in federal court. In outlining this commitment, page 11 of Pretrial Order 15 reads as follows: "Claimants who participate in the Registry commit to filing any action relating to Zantac or any ranitidine products, if at all, before this Court in MDL No. 2924." The Order then proceeds to limit the types of claims that a Claimant may bring: "Claimants further commit, to the extent that they file an action, to name only those defendants that they have a good faith belief marketed or manufactured Zantac or ranitidine products that such Claimants ingested or that they in good faith believe they may have a valid claim against for other reasons." *Id.* If a Claimant has a good faith claim that he or she wishes to bring, pursuant to the previously quoted passage, and that claim eliminates federal court diversity jurisdiction, the Claimants' commitment to file in federal court no longer applies. *Id.* ("The requirement to file in federal court shall not be applicable to actions as to which a federal court would lack diversity jurisdiction.").
> 
> The parties dispute about the commitment is summarized as follows. The Plaintiffs took the position that a Claimant would have unilateral control over whether a claim would be filed in federal court or state court because the Claimant would have control over the decision to file or not [to] file non-diverse claims. To explain, if a Claimant wanted to bring a claim against an in-state, non-diverse retailer, the Claimant could do so and, through that decision, file in state court. Conversely, a Claimant could elect to forgo a claim against an in-state retailer and, through abandonment of the claim, file his or her claim in federal court. Thus, the commitment to file in federal court in Pretrial Order 15 was, for the most part, vested in the discretion of the Claimant and the Claimant's counsel.
> 
> The Defendants took the position that the Claimants could not bring a claim against in-state retailers for "marketing or manufacturing" ranitidine, and, as a result, the

Claimants would be in violation of Pretrial Order 15 when they filed such claims in state court. The Defendants painted some Claimants' decisions to file in state court in the summer of 2021 as an attempt to avoid adverse MDL rulings. DE 4569. For context, in the summer of 2021, the Court entered its first order dismissing a Defendant from the MDL with prejudice. DE 3750. Within a few days of the Court's ruling, a member of the Plaintiffs' leadership team withdrew some Claimants from the Registry and filed their claims in state court, naming a small, in-state retailer that destroyed diversity jurisdiction as a defendant. The Defendants' fear was that the trend would continue and that, if the Defendants secured any additional favorable rulings in the MDL, the Claimants would continue to file claims against retailers in state court to avoid adverse rulings. The specifics of the Claimants' pleadings against small in-state retailer defendants also provides context to the Defendants' fears.

As an example, many states contain liability shields that protect retailers from suits involving nothing more than the routine sale of FDA-approved over-the-counter drugs. To overcome such a shield, a plaintiff must allege affirmative wrongdoing on behalf of the retailer defendant. In case number 21-CV-82174, a former-Registry-Claimant brought such a claim in state court. The case was removed to federal court over the Plaintiff's objection, and it was transferred and consolidated into this MDL over the Plaintiff's objection. After consolidation, this Court ruled on the Plaintiff's motion to remand the case back to state court. The critical issue for this Court's determination was whether the Plaintiff fraudulently joined a small, in-state retailer for the sole purpose of defeating federal court jurisdiction.

The standard for fraudulent joinder is one of the highest standards in the law. For the doctrine to apply, there must be no "possibility that a state court would find the complaint states a cause of action." *Grancare, LLC v. Thrower ex rel. Mills*, 889 F.3d 543, 549 (9th Cir. 2018). Therefore, the Court had to find that no state court would conclude that the Plaintiff stated a cause of action for affirmative wrongdoing on the part of the small, in-state retailer. To assert affirmative wrongdoing by the retailer, and to satisfy the Plaintiff's Pretrial Order 15 obligation to only bring claims in good faith, the Plaintiff alleged the following:

> To that end, Schnucks employs or employed a chief medical officer, and actively audited and researched the safety and efficacy of products offered for sale in its stores. It researched, investigated, and monitored the medical and scientific literature, as well as the regulatory and public health landscape in order to provide health resources and information, and product safety and recall information to its consumers, the general public, and Plaintiff.
>
> At all pertinent times, Schnucks knew or should have known, that NDMA is a deadly human carcinogen, known to cause a variety of

> deadly health conditions and cancers, including kidney cancer, and at all pertinent times Schnucks knew or should have known of such risks.
>
> 21-CV-82174, DE 1-3 at 43. Simply stated, it was the Plaintiff's allegation that the retailer would have known, through its employment of a chief medical officer, that the FDA's approval of an over-the-counter drug was in error and that the sale of the drug for almost forty years, in almost every country in the world, should be disregarded. This was so, according to the Plaintiff, because the chief medical officer should have independently determined that the drug caused cancer and, through that determination, refused to sell the drug.
>
> The Court concluded that the in-state retailer had been fraudulently joined for the sole purpose of defeating federal court jurisdiction, and the Court denied the Plaintiff's motion to remand the case back to state court. What this case, and many other related disputes between the parties, demonstrated to the Court was that the Claimants' commitment to file their claims in the MDL, as drafted in Pretrial Order 15, was unworkable. Because pleading standards are lenient in many states, and because it is a necessary reality that counsel—not judges—make decisions on where cases will be filed, the practical result of Pretrial Order 15 was exactly what the Defendants described. The practical result was that the commitment to file in the MDL in Pretrial Order 15 had the potential to lack any real significance, and enforcing the clause seemed problematic, if not impossible, to the Court as well.
>
> A registry without any corresponding commitment to file claims in any particular forum, be it state or federal, is unworkable as a case management tool, in the Court's opinion, because of the potential of the registry to allow for forum shopping. Because the Defendants made it clear that they would not support the creation and use of the Registry if it permitted forum shopping, the Registry's lack of an enforceable forum commitment—left unaltered—would have resulted in the Defendants' termination of the Registry. *See* Pretrial Order 15 at 12 (outlining the Defendants' retention of the power to unilaterally terminate tolling in the Registry). To correct the potential for forum shopping after the Court's *Daubert* rulings, the Court undertook an effort to address the forum selection provision in Pretrial Order 15 pursuant to its case management authority.

DE 6140 at 10-14. In sum, the Court previously concluded that the Claimants' commitment to file claims in federal court was unworkable as a case management tool, and that the commitment had to be changed in a way that was acceptable to the Defendants (and the Plaintiffs/Claimants) because, if it was not changed, the Defendants would terminate the Registry in its entirety. The

12

Court's solution, after much discussion with the parties, was Pretrial Order 72.

> In Pretrial Order 72, this Court began the process of requiring all Claimants in the Registry to make a decision on forum selection.[6] The Court explained the basis for its decision as follows:
>
>> Now, almost two years after the inception of this MDL, the time has come for the data in the Registry to be finalized; the pleadings have closed, the Plaintiffs' Leadership has designated the specific cancers it will pursue, the parties have begun the process of preparing *Daubert* challenges on the issue of general causation, and the bellwether trial selection process has begun.  For this MDL to proceed in an orderly fashion, both the parties and the Court need to know with some degree of certainty who the Claimants are, what claims they intend to file, and where the Claimants will file their claims.
>
> *Id.* at 2.  Under Pretrial Order 72, the Claimants could choose, if they wished, to certify (under penalty of estoppel) that their claims would be filed in federal court.  No Claimant, however, was *required* to certify.  The Claimants could stay silent if they wished.  But if a Claimant *did* certify, then the Claimant was committed to filing in federal court.  Through this procedure, the Court anticipated that it would evaluate whether the Registry would remain a useful tool for the management of this MDL.  If many of the Claimants certified, the value of the Registry to the MDL would be readily apparent.  If many of the Claimants did not certify, the value of the Registry to the MDL would, perhaps, be worth a second look.  At a minimum, the Court believed that the percentage of federally-registered Claimants would assist the Defendants in deciding whether they wished to continue or to terminate the Registry.[7]

DE 6140 at 14-16.

Turning back to the Plaintiffs' Motion to Vacate before this Court, the Plaintiffs emphasize the estoppel component of Pretrial Order 72, arguing that the fact that they can be estopped from

---

[6] The Court furthered additional goals in Pretrial Order 72 besides addressing forum selection.  For example, the Court required the Claimants to finalize the identity of the Defendants that they intended to sue and the claims that they intended to bring.

[7] Pursuant to Pretrial Order 15, the Defendants retained the ability to terminate tolling in the Registry.  Throughout the pendency of this MDL, the Defendants have consistently taken the position that not every Claimant need commit to filing in federal court for Defendants to maintain their support for the Registry; the Defendants have deemed 80% to be the threshold of federally-bound-Claimants at which they would not terminate tolling in the Registry. *See* DE 5991-1.

naming certain diversity-destroying-defendants is the reason Pretrial Order 72 should be characterized as a release of claims. Based upon the history of this MDL, the Court does not agree.

The parties' disputes over the commitment to file in federal court in Pretrial Order 15 demonstrated to the Court that (i) the Registry, as implemented at the time, was unworkable as a case management tool and (ii) that if the commitment to file in federal court was not altered, the Defendants would terminate the Registry. Although the parties engaged in extensive negotiations over the course of many months, they simply could not come to an agreement on how the commitment to file in federal court in Pretrial Order 15 should be adjusted. In the winter of 2022, the parties informed the Court that it would have to unilaterally create a solution and, if it did not, the Registry would end, to the detriment of all of the parties—Plaintiffs, Claimants, and Defendants alike.

To craft a solution, the Court had to consider the most important issues for each side. For the Plaintiffs' and the Claimants' part, they needed the flexibility to choose their forum—they insisted that they not be bound by the commitment to file in federal court in Pretrial Order 15. For the Defendants' part, they needed to know how many Claimants were going to file their claims in federal court, and they needed to know that any commitment for federal court could be enforced by this Court. The Court's solution was Pretrial Order 72.

To accommodate the Plaintiffs' and the Claimants' concerns, Pretrial Order 72 did not require any Claimant to certify claims for federal court. At the time the Court entered Pretrial Order 72, the Claimants were free to stay in the Registry and refuse to certify where their claims would be filed, just as they were free to leave the Registry and file their claims in state court. To accommodate the Defendants' concerns, once any Claimant certified for a federal forum, they

14

could be estopped from any attempt to circumvent the forum through artful pleading—something that Claimants had attempted to do in the past. No Claimant could object to this Court from enforcing the forum selection clause in Pretrial Order 72 because, as a condition of joining the Registry in the first instance, the Claimants had to consent to be bound by this Court's pretrial orders and to submit to the Court's exclusive jurisdiction over compliance with the pretrial orders. *See* Pretrial Order 37.

This historical background brings the Court to its ultimate point. The estoppel component of Pretrial Order 72 was intended by this Court to be a mechanism to enforce the Claimants' voluntary commitment to file in a federal forum. The Court therefore views the terms of Pretrial Order 72 as forum selection provisions that are enforceable, not as a release of claims. Indeed, the Claimants/Plaintiffs retained the ability to sue any Defendant they wished, provided the Claimant/Plaintiff established a domicile that maintained federal court jurisdiction.

### F. Final Ruling and Case Management Deadlines

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that the Plaintiffs' Motion to Vacate [DE 7311] is **DENIED**. To the extent the Plaintiffs intend to litigate their cases further, the deadlines in Pretrial Orders 81 and 83 apply. To the extent the Defendants intend to move for the Plaintiffs' cases to be dismissed, the deadlines in Pretrial Order 84 apply.

**DONE and ORDERED** in Chambers, West Palm Beach, Florida, this 15th day of August, 2024.

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

Copies furnished to Counsel of Record

15